IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Emyrtle Bennett,<br>5805 Manchester Place, NW,<br>Washington, DC 20011, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) Civil Action No. |
| v. | )<br>) |
| DISTRICT OF COLUMBIA PUBLIC<br>SCHOOLS and Michelle Rhee, in her capacity<br>As Chancellor (DCPS),<br>1200 First Street NE,<br>Washington, DC 20002 | )<br>)<br>)<br>)<br>) |
| Serve:<br>Michelle Rhee<br>1200 First Street NE,<br>10th floor<br>Washington, DC 20002 | )<br>)<br>)<br>)<br>) |
| Peter Nickles, in his capacity as<br>Attorney General<br>441 4th St. NW, Suite 1145S<br>Washington, DC 20001 | )<br>)<br>)<br>) |
| Serve:<br>Peter Nickles, Attorney General<br>441 4th St. NW, Suite 1145S<br>Washington, DC 20001 | )<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

COMPLAINT FOR DECLARATORY, INJUNCTIVE
AND MONETARY RELIEF AND JURY DEMAND

1.  This is an action for equitable relief and damages, based on discrimination in the

workplace due to Plaintiff's age in violation of her rights under The Age Discrimination

in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* and the District of Columbia

1

Human Rights Act of 1977, D.C. CODE § 2-1402, *et seq.* and in retaliation for her having

engaged in protected activity, in violation of her rights under the District of Columbia

Human Rights Act of 1977, D.C. CODE § 2-1402, *et. seq.*

2.  Defendant subjected Dr. Bennett to harassment based on age when it allowed Dr.

Bennett's coworker to make derogatory comments about her age, saying, that Dr. Bennett

was an "old fogey," "old fashion" and "senile," and also asking when Dr. Bennett

intended to retire.

3.  Dr. Bennett alleges that when she complained about the harassing conduct, Defendant did

nothing to stop the conduct, but instead terminated her employment and ultimately

replaced her with a younger employee.

### JURISDICTION

4.  This Court has jurisdiction over Dr. Bennett's claims pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3), as this matter contains a federal question.

### VENUE

5.  From 2002 to October 2009, Dr. Bennett was employed by the District of Columbia

Government Public Schools, which is located in Washington, DC.  Venue is proper in

this district under 28 U.S.C. §§ 1391(b)(1) and (2), as the Plaintiff and Defendant both

reside in the District of Columbia, and the events or omissions giving rise to Dr.

Bennett's claims occurred in the District of Columbia.

### PARTIES

6.  Dr. Bennett, Plaintiff, is an adult resident of the District of Columbia and was, at all times

relevant to this Complaint, an individual within the meaning of 42 U.S.C. §

2000e-2 and an employee and person within the meaning of D.C. CODE § 2-1401.02(9)

and (21).

7.  Defendant District of Columbia Public Schools, is the public education agency serving the District of Columbia, and was, at all times relevant to this Complaint, an employer within the meaning of 42 U.S.C. § 2000e(b) and D.C. CODE § 2-1401.02(10).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.  As to Dr. Bennett's claim under 29 U.S.C. § 621, *et seq.*, Dr. Bennett filed a charge of discrimination on March 9, 2010 with the EEOC. On September 23, 2010, 198 days from filing the charge, Dr. Bennett requested her right to sue letter. On September 29, 2010, Dr. Bennett received her right to sue letter from the EEOC.

9.  As to Dr. Bennett's retaliation claim under D.C. CODE § 2-1402.61, the statute does not require exhaustion of administrative remedies and allows for filing civil suit within one year of the unlawful discriminatory act, pursuant to D.C. CODE § 2-1403.16. Dr. Bennett is filing this complaint within one year of the unlawful discriminatory act, the termination of her employment.

10. As to Dr. Bennett's age discrimination and harassment claims under D.C. CODE § 2-1402.11, Dr. Bennett filed her charge with the DC Office of Human Rights on March 9, 2010, tolling the statute of limitations for filing a civil action under 2-1403.16(a). On September 17, 2010, 192 days from filing the charge, Dr. Bennett requested that the DCOHR dismiss her charge and provide her with a right to sue letter. The DCOHR subsequently issued a finding of no probable cause. However, the finding has no legal authority, as jurisdiction was removed from DCOHR when Dr. Bennett requested her right to sue. Dr. Bennett is filing this complaint within the one year limitations period.

11. Dr. Bennett has exhausted all administrative remedies.

## FACTUAL ALLEGATIONS

12. Dr. Bennett worked for D.C. Government Public Schools (DCPS) beginning in 1994 through 1999. Dr. Bennett worked with schools outside DCPS starting in 1999, but returned to DCPS in 2002. In 2008, she became the Lead Counselor at Calvin Coolidge Senior High School (the School). This was her position when she was the subject of a Reduction in Force (RIF) on October 2, 2009. Her supervisor at all times relevant to this complaint was Thelma Jarrett, Principal of the School.

Background

13. Dr. Bennett's date of birth is November 14, 1949.

14. Dr. Bennett was an employee of DCPS for 12 years.

15. Dr. Bennett received her Bachelor's degree in elementary education from The Ohio State University in 1972.

16. In 1974, Dr. Bennett received her Master's in guidance and counseling from The Ohio State University.

17. In 1984, Dr. Bennett received her PhD in Education/Counseling from The Ohio State University.

18. In 2004, Dr. Bennett received her Juris Doctor from the Catholic University of America.

19. Dr. Bennett is a certified and licensed professional counselor.

20. While at the School, Dr. Bennett trained the School's two other counselors, both of whom lacked high school experience, to understand and implement the School's counseling curriculum.

21. Dr. Bennett was responsible for teaching the counselors the STARS scheduling program so they could successfully complete the scheduling of 500 students before opening of school.

22. Dr. Bennett taught the other counselors at the School how to advocate for students, as well as the process for guiding students through a career assessment.

23. Dr. Bennett taught the other counselors at the School how to develop a four year academic student plan and how to how to plan and implement individual, small group, and large group guidance.

24. Dr. Bennett provided professional training to the other two counselors at the School regarding working with parent and guardians.

25. Dr. Bennett trained the School's other counselors on how to identify DCPS counseling objectives and employ strategies for achieving those objectives.

26. Dr. Bennett taught the School's other counselors how to accurately and appropriately interpret assessment data related to students and how to provide effective guidance program in collaboration with school faculty and staff.

27. Dr. Bennett was tasked with developing, and did successfully develop, a comprehensive guidance program at the School.

28. Dr. Bennett helped to drastically improve the School's graduation rate.

29. Dr. Bennett developed the new counseling process used for every guidance function and put in place all forms, letters, and invitations to outside groups.

30. Dr. Bennett produced the transcript request forms and counselor request forms, which were sanctioned by the administrator.

31. Dr. Bennett helped revamp the School's profile, establishing credibility, and developing relationships, with colleges and universities across the country to accept the School's students.

32. As a result of Dr. Bennett's efforts, students received over $5 million in scholarships and the School's graduating students had a 98% college acceptance rate.

33. Dr. Bennett drafted back-to-school orientation letters, as well as the Counseling letter to all seniors and parents with guided directions and timelines for college admissions and completion of 12th grade.

34. Dr. Bennett revamped the National Collegiate Athletic Association Clearinghouse for student athletes and worked with the NCAA Clearinghouse to get the School's students registered and approved for college sports.

35. Dr. Bennett oversaw the School's Faculty Collaborative to instruct DCPS faculty on how to assist students in completing the interest inventories, including the four year plans.

36. Dr. Bennett provided professional development school wide on how to assist students in doing the career interest inventory, complete an individual four year plan, and register for the following year's classes.

37. Dr. Bennett attended all scheduled faculty collaborative, and ran the daily counseling team collaborative.

38. Dr. Bennett taught three or more classes a day, everyday alongside of her counseling duties.

39. Dr. Bennett had an office assistance class with 10 to 15 students, and she was responsible for their class time and putting in grades and attendance.

40. Dr. Bennett was the only counselor to attend professional development outside of the School. It was one of her duties to attend all counseling professional development trainings and to return to the School and train the other two counselors.

41. Dr. Bennett led the daily morning Counseling Collaborative, which was held each morning from 8:00 am-8:45 am.   Dr. Bennett used this as her daily training of the counselors.

42. To assure the Collaborative was inclusive of all departments, Dr. Bennett planned joint collaborative with all departments.

43. Dr. Bennett orchestrated the majority of the School's Open House, including organizing resources and set up.

44. Dr. Bennett was responsible for filling in the open schedules of students.

45. With months of coordination, mailings, and communications, Dr. Bennett prepared for Fall College Night, which accessed more than 50 colleges and universities, with on the spot admission.  Dr. Bennett organized financial aid workshops in the same manner.

46. Dr. Bennett maintained the scholarship drive and scholarship newsletter, which was posted monthly and put in the School's weekly newsletter.

47. Through working with colleges and universities, Dr. Bennett established supplemental academic resources for students, including after School tutorials and SAT preparation classes.  She ran these programs while she was at the School.

48. Dr. Bennett partnered the School's after-school program with the School's alumni and the GumTree tutors from Georgetown to assure the students had a safe place and could seek help.

49. At the request of the administration and parents, Dr. Bennett was assigned to many families and students that refused to work with the School's other counselors largely due to the abrasiveness and unprofessional attitude of the other counselors.

50. Dr. Bennett was responsible for all College Board testing. She administered the school-wide program, and mailing all security driven information was her responsibility. She also assisted the younger counselor with the local school test.

51. Dr. Bennett provided supplemental resources for students regarding college preparation or post-secondary education, including assisting in acquiring grants to attend college. All of this responsibility was part of the goal to have 100% of the students get into college, and as such, Dr. Bennett successfully used any necessary resources the School needed to make the playing fields level for its students.

52. Dr. Bennett ran all the parent workshops for families, including working with failing students, how to help your child conquer testing, college process, financial aid, NCAA clearinghouse, etc.

53. Dr. Bennett initiated the guidance program for suspended students, setting up the in school suspension counseling program. She collaborated with the in-school suspension teacher and developed the counseling corner, where students with in-school suspensions could conduct interest inventories, obtain information about resources, and engage in other productive activities.

54. In order to schedule students in the correct placements to improve learning, Dr. Bennett used testing assessment data for correct placement. Dr. Bennett shepherded the use of standardized scores and the local testing to drive the push for a more rigorous college going culture. She also used transcript data to analyze appropriate placement. Dr. Bennet did this analysis on an individual basis, as well as in collaboration with faculty to develop AP Placement, and evaluate Individual Educational Plan assessments for placement and services for special education students.

55. Dr. Bennett consistently reported to work between 7:30 AM and 7:45 AM, which was earlier than when she was required to report to work for her scheduled tour of duty.

56. Dr. Bennett did not have excessive absences.

57. Dr. Bennett initiated and facilitated numerous activities and initiatives within the School and assumed the most responsibilities within the School's guidance department.

58. Although not directed to do so, Dr. Bennett completed Academic Interest Inventories when no other Counselors did. This involved sitting down with students to discuss their goals, four year plans, and hopes for the future.

59. Dr. Bennett received accolades for her efforts, performance, and achievements from DCPS officials, including Ms. Jarrett.

60. Dr. Bennett's supervisors never raised any concerns regarding Complainant's performance or attendance prior to her termination.

61. None of Dr. Bennett's students at the School, or the families of the students, ever asked DCPS remove Dr. Bennett from working with them. However, DCPS did receive requests from students and family members that the other two counselors at the School be removed from working with them.

62. While employed by DCPS, Dr. Bennett consistently received "Exceeds/Outstanding" Performance Ratings.

63. In 2009, Defendant did not provide Dr. Bennett a performance evaluation, but it provided them to the two, younger counselors who had not engaged in protected EEO activity.

### Co-Worker Harassment

64. In or around November 2008, Amanda Poorkhodakaram, a counselor at the School and coworker of Dr. Bennett's, began regularly asking Dr. Bennett when she was going to retire.

65. In or around August 2009, Ms. Poorkhodakaram began regularly telling Dr. Bennett that she was an "old fogey."

66. In or around August 2009, Ms. Poorkhodakaram began regularly telling Dr. Bennett that she was "senile."

67. In or around August 2009, Ms. Poorkhodakaram began regularly telling Dr. Bennett that she was "old fashioned."

68. At times, Ms. Poorkhodakaram made these comments in front of Ms. Jarrett.

### Relevant Protected Activity

69. On or about September 15, 2009, Dr. Bennett complained to Ms. Jarrett about Ms. Poorkhodokaram's harassing behavior.

70. From on or about September 16, 2009 through October 2009, Dr. Bennett sent numerous emails to Ms. Jarrett and other DCPS administrators opposing Ms. Poorkhodakaram's harassing behavior.

71. When Dr. Bennett complained to Ms. Jarrett and other DCPS administrators about Ms. Poorkhodokaram's harassing behavior, she informed Ms. Jarrett that Ms. Poorkhodokaram was subjecting her to harassing remarks and treatment based on her age and that the harassment needed to stop.

Reduction-in-Force

72. On October 2, 2009, Defendant notified Ms. Bennett that she was the subject of the RIF, and that the factors upon which DCPS was basing the RIF were as follows:

   a.   Needs of the School;

   b.   Significant relevant contributions, accomplishments, accomplishments or performance, performance;

   c.   Relevant supplemental professional experience, as demonstrated on the job; and

   d.   Years (i.e., length) of service.

73. Defendant afforded the following weight to each category: Needs of the school, 75%; Significant relevant contributions, accomplishments, accomplishments or performance, performance, 10%; Relevant supplemental professional experience, as demonstrated on the job, 10%; years (i.e., length) of service, 5%.

74. To support its decision to lay off Dr. Bennett, and not either of the other two counselors, DCPS alleged that Dr. Bennett:

   a.   Failed to complete Academic Interest Inventories;

   b.   Failed to arrive on time for work on multiple occasions;

   c.   Failed to contribute to School-wide initiatives;

   d.   Rarely attended Collaborative Planning sessions; and

   e.   Argued with Staff.

75. DCPS subjected Dr. Bennett to the RIF, but it did not subject the other two, younger counselors who had not opposed discriminatory harassment, to the RIF.

76. Shortly after Defendant terminated Dr. Bennett, the School has hired a third, younger counselor.

## Damages

77. Had Dr. Bennett not been terminated, she would have continued to receive a salary. However, despite her efforts to obtain gainful employment, Dr. Bennett has been unemployed since her termination.

78. Dr. Bennett's reputation has been irreparably harmed, and she was publicly embarrassed.

79. Dr. Bennett has had to file for bankruptcy as a result of her termination.

80. Dr. Bennett has experienced anxiety, depression, sleeplessness, hair loss, weight loss, agitation, hypertension, and nervousness as a result of the actions described above.

81. Dr. Bennett could not see her doctors for the injuries she suffered because she lost her insurance coverage.

82. Dr. Bennett had problems paying rent, as well as problems financially helping her children.

83. Dr. Bennett took all appropriate actions to mitigate damages.

## COUNT 1: HARASSMENT ON THE BASIS OF AGE IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967.

84. Dr. Bennett incorporates all the allegations contained in paragraphs 1 – 83 as if stated herein.

85. Under the ADEA, it is unlawful employment practice for an employer to knowingly allow an employee to harass a coworker, thereby affecting the terms, conditions, or privileges of employment, due to that individual's age.

86. From November 2008 through September 2009, Ms. Poorkhodakaram subjected Dr. Bennett to harassment based on Dr. Bennett's age, including but not limited to:

   a. Beginning in or around November 2008, regularly asking Dr. Bennett when she was going to retire.

   b.  Beginning in or around August 2009, regularly telling Dr. Bennett that she was an
       "old fogey."

   c.  Beginning in or around August 2009, regularly telling Dr. Bennett that she was
       "senile."

   d.  Beginning in or around August 2009, regularly telling Dr. Bennett that she was
       "old fashioned."

87. Dr. Bennett informed Ms. Jarrett and other DCPS Administrative officials of this

    harassment and requested that they put a stop to it, but DCPS took no action in response

    to Dr. Bennett's allegations of harassment and ultimately terminated Dr. Bennett's

    employment.

88. These acts constitute a violation of 29 U.S.C. § 621, *et seq.*

89. These acts were taken in willful violation of Dr. Bennett's rights under the ADEA.

90. As the direct and proximate result of the acts and omissions of Defendant as described

    above, Dr. Bennett suffered loss of pay and benefits, including, but not limited to, salary,

    health insurance, diminished future earning capacity, and other liquated damages within

    the meaning of 29 U.S.C. § 626(b).

## COUNT 2: HARASSMENT ON THE BASIS OF AGE IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977.

91. Dr. Bennett incorporates all the allegations contained in paragraphs 1 – 90 as if stated

    herein.

92. Under the DCHRA, it is unlawful employment practice for an employer to knowingly

    allow an employee to harass a coworker, thereby affecting the terms, conditions or

    privileges of employment, due to that individual's age.

93. From November 2008 through September 2009, Ms. Poorkhodakaram subjected Dr.

    Bennett to harassment based on Dr. Bennett's age, including but not limited to:

    a. Beginning in or around November 2008, regularly asking Dr. Bennett when she
       was going to retire.

    b. Beginning in or around August 2009, regularly telling Dr. Bennett that she was an
       "old fogey."

    c. Beginning in or around August 2009, regularly telling Dr. Bennett that she was
       "senile."

    d. Beginning in or around August 2009, regularly telling Dr. Bennett that she was
       "old fashioned."

94. Dr. Bennett informed Ms. Jarrett and other DCPS Administrative officials of this

    harassment and requested that they put a stop to it, but DCPS took no action in response

    to Dr. Bennett's allegations of harassment and ultimately terminated Dr. Bennett's

    employment.

95. These acts constitute a violation of D.C. CODE § 2-1402.11.

96. These acts were accompanied by conduct and a state of mind evincing malice or its

    equivalent.

97. As the direct and proximate result of the acts and omissions of Defendant as described

    above, Dr. Bennett suffered loss of pay and benefits, including, but not limited to, salary,

    health insurance, diminished future earning capacity, emotional pain and suffering,

    inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and

    nonpecuniary losses within the meaning of D.C. CODE § 2-1403.16.

**COUNT 3: RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977.**

98. Dr. Bennett incorporates all the allegations contained in paragraphs 1 – 97 as if stated herein.

99. Under the DCHRA, it is an unlawful employment practice for an employer to retaliate against any individual on account of having exercised any right protected under the DCHRA or because that person has opposed any practice made unlawful by the DCHRA.

100.    Beginning on or around September 15, 2009, Dr. Bennett exercised her rights under the DCHRA and opposed discrimination when she contacted Ms. Jarrett and other DCPS administrative officials to oppose and complain of the discriminatory harassment to which Ms. Pookhodakaram was subjecting her.

101.    On October 2, 2009, the Defendant terminated Dr. Bennett.

102.    Defendant took no remedial action.

103.    The individuals involved in the RIF had knowledge of Dr. Bennett's opposition to discriminatory harassment based on their receipt of her complaints and chose to lay her off because of such opposition.

104.    These acts constitute a violation of D.C. CODE § 2-1402.61.

105.    These acts were accompanied by conduct and a state of mind evincing malice or its equivalent.

106.    As the direct and proximate result of the acts and omissions of Defendant as described above, Dr. Bennett suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses within the meaning of D.C. CODE § 2-1403.16.

15

**COUNT 4: DISCRIMINATORY TERMINATION ON THE BASIS OF AGE IN
VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977.**

107.     Dr. Bennett incorporates all the allegations contained in paragraphs 1 – 106 as if

stated herein.

108.     Under the DCHRA, it is an unlawful employment practice for an employer to

discharge an individual due to the individual's age.

109.     On October 2, 2009, the Defendant terminated Dr. Bennett.

110.     The individuals involved in the RIF had knowledge of Dr. Bennett's age as a

result of their familiarity with her and based their decision on her age.

111.     After terminating Dr. Bennett, the Defendant hired another counselor to replace

her, who was much younger than Dr. Bennett.

112.     These acts constitute a violation of D.C. CODE § 2-1402.11.

113.     These acts were accompanied by conduct and a state of mind evincing malice or

its equivalent.

114.     As the direct and proximate result of the acts and omissions of Defendant as

described above, Dr. Bennett suffered loss of pay and benefits, including, but not limited

to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain

and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other

pecuniary and nonpecuniary losses within the meaning of D.C. CODE § 2-1403.16.

**COUNT 5: DISCRIMINATORY TERMINATION ON THE BASIS OF AGE IN
VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967.**

115.     Dr. Bennett incorporates all the allegations contained in paragraphs 1 – 114 as if

stated herein.

116.     Under the ADEA, it is an unlawful employment practice for an employer to discharge an individual due to the individual's age.

117.     The individuals involved in the RIF had knowledge of Dr. Bennett's age.

118.     After terminating Dr. Bennett, the Defendant hired another, younger counselor to replace her.

119.     These acts constitute a violation of 29 U.S.C. § 621, *et seq.*

120.     These acts were taken in willful violation of the ADEA.

121.     As the direct and proximate result of the acts and omissions of Defendant as described above, Dr. Bennett suffered loss of pay and benefits, including, but not limited to, salary, health insurance, diminished future earning capacity, and other liquated damages within the meaning of 29 U.S.C. § 626(b).

**WHEREFORE,** Dr. Bennett prays this Court to:

a.     Grant judgment in her favor against Defendant;

b.     Grant her declaratory and injunctive relief, including but not limited to reinstating Dr. Bennett to her position with the Defendant;

c.     Award her back pay, compensate her for lost benefits, and otherwise make her whole;

d.     Award her compensatory damages in an amount to be shown at trial;

e.     Award her punitive damages in an amount to be proven at trial;

f.     Award her reimbursement of the attorneys fees and costs she has expended in litigating this matter; and

g.     Grant her such other and further relief as justice may require.

## JURY DEMAND

Dr. Bennett hereby demands a trial by jury on all claims so triable.

17

October 1, 2010

Respectfully Submitted,                          Respectfully Submitted,


_____                      _____
Gary M. Gilbert (MD Bar MD 15808)              Ari Micha Wilkenfeld (Bar. No. 461063)
The Law Offices of Gary M. Gilbert              The Law Offices of Gary M. Gilbert
and Associates                                  and Associates
Attorneys for Dr. Bennett                       Attorneys for Dr. Bennett
8401 Colesville Road, Suite 300                 8401 Colesville Road, Suite 300
Silver Spring, MD 20910                         Silver Spring, MD 20910
Telephone: 301-608-0880                         Telephone: 301-608-0880
Facsimile: 301-608-0881                         Facsimile: 301-608-0881
Gary@ggilbertlaw.com                            awilkenfeld@ggilbertlaw.com